[Civ. No. 5462.   Fourth Dist.   May 16, 1957.]

FALLBROOK PUBLIC UTILITY DISTRICT, Appellant,
v. GENE E. MARTIN, as Executrix, et al., Defendants;
VERLIE L. BAYLE et al., Respondents.

Swing, Scharnikow & Staniforth for Appellant.

George Stahlman and Hayes & Hayes for Respondents.

MUSSELL, J.—This is an action in eminent domain in which Fallbrook Public Utility District, organized under the laws of the State of California for the purpose, among others, of procuring, storing and distributing water to the lands lying within the boundaries of said district in the county of San Diego for irrigation and domestic purposes, seeks to acquire lands for a dam and reservoir site on the Santa Margarita River in which to store water to be later supplied to the consumers and lands within the district. The defendants who appeared herein raised numerous affirmative defenses and the action proceeded to trial as to the issues thus raised by

this group. The trial court rendered judgment that plaintiff take nothing as to defendants named in the judgment and plaintiff district appeals.

The Fallbrook Public Utility District (hereinafter referred to as the "District") was first organized in 1922 and embraced about 450 acres. In 1937-1938 the area of the district was increased to approximately 5,000 acres by taking over parts of the Fallbrook Irrigation District, which was then disincorporated. In 1950, about 3,000 acres was added to the district by annexation, bringing the total area thereof to approximately 8,000 acres. There are extensive plantings of citrus and avocado orchards in this area, the average rainfall is about 17 inches per year, the climate is nearly frostless, and the rapid growth and development of the area was shown by continuous annual increases in the assessed valuation, meter installations and water sales.

The District, when first organized, obtained its water from wells, but this source proved to be inadequate. Numerous studies were made in the Fallbrook area for the development of water supplies, which studies indicated that it was necessary to depend upon storage and conservation of winter flood waters of the Santa Margarita River for the water necessary to the development of the area. The Fallbrook Irrigation District, predecessor in interest of the plaintiff district, applied to the state for a permit for appropriation of water from the Santa Margarita River and a permit was issued, but the irrigation district did not have the financial resources to construct a reservoir to store 35,000 acre-feet of water at the site selected, which was approximately at the same place as the Fallbrook-Lippincott Dam as proposed by appellant herein.

In 1946 a cooperative agreement was made by the District with the State Division of Water Resources for it to make the necessary investigations, surveys and studies and the preparation of a written report, and on November 1, 1948, the state reported favorably on the Fallbrook-Lippincott site and gave preliminary estimates of costs and of safe yields at that location for dams varying in height up to 142 feet above streambed.

In 1949 the corps of Army engineers completed a study of several possible multiple-purpose projects on the Santa Margarita River, including a reservoir at the Fallbrook site, and found that the ·Fallbrook site was feasible and would have large tangible and intangible benefits. In 1951 the United States commenced an action against Fallbrook Public Utility

District (110 F.Supp. 767), claiming title to most of the water of the Santa Margarita River for its own use at Camp Pendleton and judgment was rendered by Judge Yankwich approving their claims. Subsequently, Congress attempted to settle the litigation by legislation and on July 28, 1954, enacted Public Law 547 authorizing the building of a dam at the De Luz site for the joint use of the Navy and Fallbrook. On March 30, 1956, the Yankwich judgment was reversed and most of the Navy claims were disapproved by the decision of the United States Court of Appeals. (*People of the State of California* v. *United States,* 235 F.2d 647.) The Army engineers' recommendations and the authorization of Congress for the building of the dam at the De Luz site resulted in the construction of no project, either for the benefit of Fallbrook or the Navy.

In 1953 the District directed that a study be made by its chief engineer and in the report thereon it was recommended that the board of directors build a 30,000-35,000 acre-foot capacity reservoir at the Fallbrook-Lippincott site but that the construction of the dam be made in three successive stages.

The District's records of sales of water for use on the lands and by the people within the District show a continuous and steady increase year after year, culminating in about 8,000 acre-feet in the year preceding the trial herein. In the winter months little water is required and the summer months bring peak usage. The variations in water demands run from a low of 175 acre-feet in a winter month to 1,361 acre-feet in a summer month.

The present available water supplies of the District are:

(1) Two and one-half cubic feet per second direct diversion from the Santa Margarita River under State Permit Number 7033 (1,800 acre-feet if taken throughout the year).

(2) Twenty-five hundred acre-feet per annum from San Luis Rey River under State Permit Number 5227 ''subject to vested rights.'' However, in 1954 this source was cut off by temporary injunction until the underground water table should again rise to a level of not less than 18 feet below ground surface.

(3) From the Colorado River, being water received by Fallbrook from the San Diego Water Authority via the Metropolitan Water District by virtue of Fallbrook's membership in the San Diego Water Authority, which, in turn, reserves the water by virtue of its membership in the Metropolitan Water District. Fallbrook's entitlement is about 1,100 acre-

feet per, annum. The District has benefited by the purchase of excess Colorado River water but there was no excess Colorado River water available at the time of trial and for a year prior thereto.

(4) From the city of San Diego. The city agreed with the District to permit it to store its unused Colorado River entitlement existing during the winter months in the city's San Vicente reservoir and during the following summer months to take substantially the same amount of the city's Colorado River water, on an exchange basis, out of the main aqueduct at the point where the water passes the Fallbrook area. However, the city notified the District that it could not continue the storage exchange agreement as a permanent arrangement and that the District would have to arrange for other storage.

The existing reservoirs and storage capacities of the District are:

Two reservoirs located at the District's pumping plant on the Santa Margarita River with capacity of 200,000 and 400,000 gallons, respectively.

Martin reservoir. Capacity 1,000,000 gallons.

Lang reservoir, 1,000,000 gallons.

Sand Trap reservoir. Capacity 100,000 gallons.

Red Mountain reservoir. Capacity 200 acre-feet.

Rattlesnake reservoir (a steel tank). Capacity 3,500,000 gallons.

The directors of the District found these reservoirs were inadequate for any carry-over storage and sufficient to meet only temporary emergencies of short duration and they therefore hired storage facilities from the city of San Diego.

On January 10, 1955, the board of directors of the District adopted its resolution Number 448 in which it was declared that the public interest, convenience and necessity of the District required the construction and completion by it of a public improvement, to wit, a dam on the Santa Margarita River, and the creation of a reservoir for the impounding and storage of the water behind said dam and the acquisition of real property as a site for said dam and reservoir; that the need for said public utility works has continued and still exists; that the proposed public utility works are planned and located in the manner which will be most compatible with the greatest public good and the least private injury. It was further declared and ordered that the District prepare and prosecute in its name such suit or suits in the proper court having jurisdiction thereof as were necessary to condemn, take

and acquire said real property or any part thereof. This resolution had the approval of the voters of the District for the record shows that at the biennial district election in May, 1954, one of the principal issues was the construction of the Lippincott Dam, and two directors of the District who favored the policy of the board in building the dam were elected. It also appears that at the biennial district election in May, 1956, three directors favoring the District plan to build the Lippincott dam were elected. The record shows that the results of several engineering studies and reports were made available to and given consideration by the board of directors before the resolution was passed and that the directors had substantial evidence before them showing the necessity of the project. In accordance with this resolution the present action was filed on January 14, 1955.

Respondents state in their brief that ''The crux of the appeal issue centers on the finding of the trial court that the appellant failed to make a showing of necessity for the project proposed and described by the testimony.''

Appellant's first contention is that the trial court erred in its findings and conclusions that there was not any surplus waters in the Santa Margarita River available for appropriation and that the Fallbrook Utility District had not acquired rights therein by virtue of its permits and pending applications.

In its finding Number XIX the court found that ''There are insufficient surplus waters available to the Fallbrook Utility District at this time in the Santa Margarita River to warrant the construction by the District of a dam at this time.''

However, the record shows that large quantities of waste waters flow into the ocean from the Santa Margarita River after all upstream requirements have been met and that there is surplus water sufficient for appropriation by the District. Defendants' own witness, Max Bookman, principal hydraulic engineer for the Division of Water Resources of the State of California, testified that he had recently made a study of the Santa Margarita River to find a plan that would best conserve the unappropriated water in the watershed and that a 35,000 acre-foot reservoir at the Lippincott site would create 5,100 acre-feet net safe yield of ''new water which is now wasting into the ocean''; that by the United States Geological Service Gaging Station records at Ysidora, near the ocean on the Santa Margarita River, under normal conditions, ''there

is about 36,000 acre-feet of wastage to the ocean; that "at the present time, with Vail reservoir constructed and with Vail reservoir in full operation and the present utilization of water in the Santa Margarita basin, the wastage to the ocean on the average is about 25,200 acre-feet per year."

One of appellant's expert witnesses, William Penn Rowe, a hydraulic engineer of extensive experience and familiar with the Santa Margarita River, estimated the annual waste into the ocean, which is surplus water, at the present time will average around 32,000 to 35,000 acre-feet. He recommended the so-called Lippincott site as the best site at which Fallbrook could build a dam to store the surplus waters of the Santa Margarita River and stated that in his opinion such a dam was economically feasible and would yield about 5,100 feet per annum.

Appellant's chief engineer, in his 1953 report to the board of directors of the District, recommended the building of a dam at the Fallbrook-Lippincott site to create a reservoir with an ultimate capacity of approximately 30,000 to 35,000 acre-feet. At the trial he produced and explained charts, graphs and diagrams showing that ample surplus water existed in the Santa Margarita River during flood seasons, which, if stored and conserved, would meet the present and future growth requirements of the District.

In 1956 there was published by the State Division of Water Resources, Department of Public Works a bulletin giving the results of an investigation by the department of the Santa Margarita River and the official state figures reveal an average wastage into the ocean of 34,000 acre-feet per annum which constitutes "surplus" which, under the laws of this state, is subject to appropriation.

We find no substantial evidence in the record to support the trial court's finding Number XIX and agree with appellant's contention that it is contrary to and unsupported by the evidence.

In finding Number XVI the court found "That the Fallbrook Public Utility District does not have established or vested rights in the waters of the Santa Margarita River sufficient to warrant the construction of any dam at this time." This finding is likewise unsupported by and contrary to the evidence.

The record shows that the state has issued its permit Number 8511 to the District for 10,000 acre-feet of the Santa Margarita River water. This permit was and is an administrative deter-

mination on the part of the State Division of Water Resources that there exists surplus water in the Santa Margarita River in amounts sufficient to warrant it in issuing that permit. Appellant also has applications Numbers 12178 and 12179 which will give Fallbrook Public Utility District certain additional legal rights and priorities to the waters of the Santa Margarita River.

In *City of Pasadena* v. *City of Alhambra*, 33 Cal.2d 908, 925-926 [207 P.2d 17], it is said:

''Public interest requires that there be the greatest number of beneficial uses which the supply can yield, and water may be appropriated for beneficial uses subject to the rights of those who have a lawful priority. (*Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 368 [40 P.2d 486].) Any water not needed for the reasonable beneficial uses of those having prior rights is excess or surplus water. In California surplus water may rightfully be appropriated on privately owned land for non-overlying uses, such as devotion to a public use or exportation beyond the basin or watershed. (Citations.)

''It is the policy of the state to foster the beneficial use of water and discourage waste, and when there is a surplus, whether of surface or ground water, the holder of prior rights may not enjoin its appropriation. (*Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 368-369, 372 [40 P.2d 486]; see 26 Cal.Jur. 277.)''

Judge Yankwich in his decision in *United States* v. *Fallbrook Public Utility Dist.*, 110 F.Supp. 767, *supra*, found that there was no surplus water available at that time sufficient to appropriate. However, the Ninth Circuit Court of Appeals, after quoting that finding and the further finding that ''There is no surplus water at the present time available for appropriation from the Santa Margarita River system; that there was no surplus so available in the year 1946; that there was no surplus so available when Camp Pendleton was placed in operation as a military installation in 1942,'' said, ''If these are findings of fact, they are clearly erroneous; and, if conclusions of law, they are wrong.'' The circuit court further said ''It is certain from the evidence in the case that in some years there is surplus water which flows clear through the watershed and into the ocean.''

Appellant next contends that the trial court erred in its decision that public interest, convenience and necessity did not require Fallbrook Public Utility District building a dam and reservoir on the Santa Margarita River at this time,

and that public interest, convenience and necessity did not require the district acquiring lands for that purpose. These conclusions of the trial court are not supported by the evidence and are inconsistent with its findings that the district has been distributing about 8,000 acre-feet of water per year, including 2,800 acre-feet of Colorado River water last year; that plaintiff is greatly in need of new and additional water supplies; that plaintiff has state permits to appropriate and store at the Lippincott site 10,000 acre-feet per annum of the surplus water of the Santa Margarita River; that the Lippincott site proposed by plaintiff for the project is feasible from an engineering standpoint; that plaintiff is able to finance the building of the proposed dam and reservoir project; and that before the commencement of this action the board of directors of the district adopted a resolution declaring that "the public interest, convenience and necessity require the construction and completion of a public improvement, to wit, a dam on the Santa Margarita River, . . . and the creation of a reservoir for the impounding and storage of water behind said dam," and the acquisition of a site therefor. The court, in its conclusions of law, declared that under the existing circumstances the board of directors was and is entitled to exercise a wide discretion in planning and acquiring land for water facilities and constructing projects thereon, which, in its best judgment is in the public interest of the district; that said board is entitled to take into consideration not only the present but also the future needs and requirements of the District.

Appellant further contends that the court erred in imputing fraud or bad faith to plaintiff and in basing his decision, in part, upon the assumed existence of such fraud or bad faith in this case. Defendants allege in their answer that the district was guilty of "bad faith" in the filing of a condemnation action in 1951, intending thereby to coerce the defendants in failing to prosecute said action. However, defendants failed to prove bad faith of plaintiff in bringing this action and it was dismissed by the District on January 14, 1955. No other allegations of fraud are contained in the answers filed. The trial court found in its finding Number XI:

"That the said District, acting through its general manager, urged the engineer of the San Diego County Water Authority to suppress information concerning certain plans of the District for the project; and the District, acting through its said general manager, repeatedly stated publicly that the

'dam' would not cost more than one million dollars; and the District, acting through its said general manager, stated publicly that all required plans for the project had been approved by the proper state authorities, withholding the information that no such plans were necessary; and the land agent for the District, acting for the District, attempted to coerce some of the condemnees to sell their land to the District by making various threats to harm said condemnees; and the District, acting through its directors and agents, misrepresented to the public that all plans and specifications for the dam had been completed.''

However, the court, in its memorandum decision, after reviewing the matters related in finding Number XI, said, ''However, it has not been shown that this fraudulent conduct of the District officers was successful, and hence is not sufficient to vitiate the proceedings before us.'' The first incident stated in finding XI relates to a letter written by appellant's general manager to the general manager of the San Diego County Water Authority. This letter was written four years before the instant action was commenced and while it was suggested therein that the matter should not be discussed publicly and that it was unwise at that time to discuss any type of annexation, it appears that the purpose of the letter was to obtain advice from the San Diego County Water Authority. The second incident referred to in said finding is that the District's manager repeatedly stated that the ''dam'' would not cost more than one million dollars. This statement was no doubt made by the manager. However, he may well have believed it to be true and this statement does not appear to have been made in bad faith. Moreover, in the engineer's report to the board of directors in 1953, the overall cost for the project was shown to be $3,373,500 and this report was well publicized at the time. The third incident is that plaintiff's general manager stated publicly that all required plans for the project had been approved by the state authorities, withholding the information that no such plans were necessary. However, as the trial court said in his memorandum decision: ''It is not necessary for the condemnor to show that he had obtained in advance all of the permits and plans necessary before the land is condemned.'' (Citing *California Southern R. R. Co.* v. *Kimball*, 61 Cal. 90; *Vallejo etc. R. R. Co.* v. *Home Savings Bank*, 24 Cal.App. 166 [140 P. 978]; *Tuolumne Water etc. Co.* v. *Frederick*, 13 Cal.App. 498, 502, 503 [110 P. 134]; *Sacramento etc. Dist.* v. *Pacific Gas & Electric Co.*, 20 Cal.2d 684 [128 P.2d 529].)

It is next stated in finding XI that the land agent for the District attempted to coerce some of the condemnees to sell their land to the district by making various threats to harm said condemnees. We have been unable to find any testimony in the record to support this specification. The same is true as to the next incident specified in said finding that the directors misrepresented to the public that all plans and specifications for the dam had been completed. The incidents related in the court's finding Number XI are not, in our opinion, sufficient to establish that the appellant was guilty of fraud or acted fraudulently in commencing or maintaining the instant action. Since fraud or abuse of discretion was not established, it follows that the determination of the board of directors as reflected by their resolution could not be disturbed by the trial court and is binding upon us. (*Berkeley High Sch. Dist.* v. *Coit*, 7 Cal.2d 132, 137-138 [59 P.2d 992] ; *West etc. Ins. Co.* v. *Glenn-Colusa Irr. Dist.*, 50 Cal.App.2d 204, 209 [122 P.2d 595] ; *Ransom* v. *Los Angeles City High Sch. Dist.*, 129 Cal.App.2d 500, 505 [277 P.2d 455] ; *Lindell Co.* v. *Board of Permit Appeals*, 23 Cal.2d 303, 315 [144 P.2d 4].)

Fraud is odious and is never presumed; it must be established by proof. (*Hedden* v. *Waldeck*, 9 Cal.2d 631, 636 [72 P.2d 114].) And, as is said in *Hannon* v. *Madden*, 214 Cal. 251, 267-268 [5 P.2d 4] :

"It is a cardinal rule of pleading that fraud must be pleaded in specific language descriptive of the acts which are relied upon to constitute fraud. It is not sufficient to allege it in general terms, or in terms which amount to mere conclusions. . . . Fraud being a term which imputes venalty and corruption to the person charged, should be clearly proved and satisfactorily established, especially where the persons charged are public officers vested with wide discretionary powers. If official acts may be explained on any reasonable theory of duty honestly, even though mistakenly performed, they must be resolved in favor of the presumption, which may not be lightly ignored."

Finally, appellant contends that the trial court erred in concluding that "the plaintiff in this case, acting through its officials, had abused that discretion" vested in them by law, to wit, the "planning and acquiring land for water facilities and constructing the projects thereon which in their best judgment is in the public interest of the Fallbrook Utility District" and "that further expenditure of funds at this time by the District officials toward the construction of the

proposed project would be an abuse of discretion by the officials of said District.''

Apparently, the basis for the court's conclusion that there was an abuse of discretion is the finding that ''there are insufficient surplus waters available to the Fallbrook Utility District at this time in the Santa Margarita River'' and ''that the district does not have rights in the waters of the Santa Margarita River sufficient to warrant the construction of any dam.'' However, the evidence and the findings of the trial court that the District is vested with the power and obligation of furnishing water to the lands and residents within the district; that it is anticipated that its present supply will diminish in succeeding years; that plaintiff is greatly in need of additional water supplies; that plaintiff's board of directors adopted a proper resolution reciting that the public interest, convenience and necessity required this public improvement; that the proposed project would be for storing surplus waters of the Santa Margarita River; that the lands sought to be condemned would be for a public use; that the project would cost about three million dollars; that the plaintiff is able to finance such a project; that the Lippincott site selected by plaintiff is feasible from an engineering standpoint; that plaintiff has a state permit to appropriate 10,000 acre-feet per annum of the surplus waters of the Santa Margarita River for storage at the Lippincott site and has two additional pending applications, each for 10,000 acre-feet of the river water; that the total average annual flow of the river at the site is about 8,000 acre-feet but that over 25,000 acre-feet of water per annum, on an average, have and will continue to waste into the ocean, all fully support the action of the board of directors of the District and the condemnation sought in the complaint herein. The good faith of the directors was established by the evidence and no abuse of discretion appears.

The judgment is reversed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied June 13, 1957, and respondents' petition for a hearing by the Supreme Court was denied July 10, 1957.